**Max Young HARRIS, Jr., Appellant,**

v.

**Ramon CANTU, et al, Appellees.**

**No. 13–84–350–CV.**

Court of Appeals of Texas, Corpus Christi.

Aug. 30, 1985.

Rehearing Denied Sept. 26, 1985.

William L. Hubbard, Harlingen, for appellant.

Tony Martinez, Brownsville, for appellees.

Before QUENTIN KEITH,[1] UTTER and KENNEDY, JJ.

## OPINION

KEITH, Justice.

Defendant below appeals from a judgment which awarded the plaintiffs $16,200 as actual damages and $35,000 as punitive damages for injuries received when plaintiffs' car was struck from the rear by the car driven by defendant. Defendant admitted that his failure to keep a proper lookout was a proximate cause of the collision. The first two points of error challenge the award of the punitive damages, asserting that there was no evidence to support the finding of gross negligence.

First, an abbreviated account of the events leading up to the accident is necessary. On May 29, 1983, Ramon Cantu and his family had been to Matamoros, Mexico, shopping and visiting relatives. They were traveling on the main highway toward their home in San Benito at a speed of about fifty miles per hour when, between 10:00 and 10:30 p.m., their car was struck by one driven by defendant. Cantu, the driver, was thrown violently about his car when the seat was torn loose, and his body was thrown to the floor of the car. His wife and one child were in the front seat with him, while four other children were asleep on the back seat.

After the Cantu car stopped, Cantu emerged, trying to ascertain if anyone was seriously hurt. It seemed that everyone was in pretty good shape, but very frightened. Cantu did not feel he was injured at that time, but began feeling pain the next day. He went to see his family physician in Matamoros the next day. The children were x-rayed for internal injuries, with none being found.

Cantu was sent by his attorneys to a neurosurgeon for examination and treatment. Dr. Kuri, with impressive credentials, testified by deposition that he first saw Cantu about six weeks after the acci-

---

1. Associate Justice, Court of Appeals, Ninth Supreme Judicial District (Ret.), sitting by designation. *See* TEX.REV.CIV.STAT.ANN. art. 1812 (Vernon Supp.1985).

dent. His examination revealed a lack of complete motion in his back, together with tenderness and pain in the low back area. He diagnosed the injury as a sprain or tear of the ligaments and muscles of the back, although there was no fracture or dislocation noted. He recommended conservative treatment.

Dr. Kuri testified that Cantu was not as strong as he was before the accident. He testified that there was no evidence of muscular atrophy or loss of strength of the legs. He released him from treatment on July 21, 1983.

Prior to the accident, Cantu had been employed, earning about $160 per week. He told the jury that he did not feel competent to do his usual work for three months after his injury and followed Dr. Kuri's advice not to lift or strain his back. Although employed at the time of trial, making about $140 per week, Cantu said that he did not feel able to always perform all of his job duties in an auto parts store and feels sick a day or two each week. He had not been back to see Dr. Kuri for about a year between Kuri's discharge and the trial date.

Only one of the children, Eloisa, appears to have been seriously injured in the collision. The mother of this twelve-year-old child, Mrs. Cantu, testified that Eloisa complained of pain the next day. She took the child, along with the other children, to see a physician, but nothing of any consequence was found wrong with any child. Eloisa was the only one who really complained of pain, but her mother said that she now has pain "only once in awhile … but not often."

The appellant (defendant), Max Harris, age 21, a resident of Harlingen, had just completed his freshman year at Schreiner College in Kerrville, intending to go to classes at Texas Southmost College in Brownsville during the summer. During the day of the accident, Harris had been to the beach with his friend, Richard Purdom, but denied any memory of having drunk beer while at the beach. He said that, if he had had any beer, it would not have been more than one or two. He and Purdom left the beach about 6:00 p.m. and ate dinner at Purdom's place, having nothing intoxicating to drink with the meal. After dinner, they called some girls to invite them to go to Mexico for "some appetizers and a few drinks." The foursome met at the home of Harris' date, Katherine Koppel, and went to Mexico from there. On the trip, they had some car trouble and returned to Koppel's house to get Harris' car, a Datsun 280Z. Harris drove to Mexico at a speed of 55 or 60 miles per hour, Koppel asserting that the speed was more like 65–70 miles per hour. No beer was consumed on the trip to Matamoros.

They arrived at a cafe in Matamoros about 9:00 p.m., going to Garcia's Restaurant where they ordered drinks, Harris asserting that, while there, he had no more than two drinks. However, he did not dispute Koppel's version that each of the group had three or four drinks.

They left Garcia's about 11:00 p.m., with Harris driving and did not stop any time before the accident. The Harris vehicle was a two-seat hatchback type of car and, as the party returned, Harris was driving with Purdom's date sitting on his lap on the front bucket seat. Koppel was on the back seat with her feet resting upon the console between the two front seats. Harris said that he was going at a speed of 55 to 60 miles per hour, but, again, Koppel disagreed, putting the speed at 65–70 miles per hour. Harris says that he never saw the Cantu car, and Koppel does not assert that she ever saw the car before the impact.

After the collision, the parties emerged from the Harris car; and, within a few minutes, police officers and an ambulance arrived. Officer Torres testified that Harris had an odor of alcohol on his breath, that his eyes were bloodshot, his speech was slurred, and that there were beer cans all about Harris' car. Officer Maldonado corroborated Torres in all material particulars. Within a few minutes, Harris, while standing talking to the officers, "passed out" and fell across the hood of his car. He was revived shortly by the medical at-

tendants and placed in the ambulance for transport to the hospital. Arnold Flores, one of the medical attendants, spoke of a very strong odor of alcohol on his breath and said that Harris was very belligerent, objecting strenuously to being taken to the hospital.

We have no evidence of any tests taken in connection with Harris' apprehension to determine the degree of his intoxication, nor do we have any evidence that Harris had any difficulty in managing the vehicle as he left Matamoros, no evidence of weaving on the road, becoming lost or confused, nor did any of his passengers complain of his driving.

The negligence issue was submitted broadly, and the jury was instructed that they could consider the following acts or omissions on the part of Harris in answering the question:

(1) driving at a greater rate of speed then (sic) a person using ordinary care would have driven;

(2) failing to keep a proper lookout as a person of ordinary care would have kept;

(3) driving while under the influence of intoxicating liquors.

The jury answered by "yes." It also found that the negligence was a proximate cause of the occurrence in question.

Cantu's contributory negligence was confined to two omissions:

(1) operating his vehicle when he had no well-lighted tail lights, and/or

(2) operating his vehicle without at least two tail lights capable of emitting a red light plainly visible from a distance of one thousand feet to the rear.

This contributory negligence issue was answered by "no," and the contingently submitted proximate cause issue was unanswered. Harris' negligence was found to be 100%, while 0% was attributed to Cantu.

Special Issue No. 8 submitted gross negligence on the part of Harris in this language:

"Do you find from a preponderance of the evidence that on the occasion in question Max Young Harris, Jr., was grossly negligent in the operation of his vehicle?"

The jury was instructed:

"Gross Negligence" means heedless and reckless disregard which means more than momentary thoughtlessness, inadvertence, or error of judgment. It means such an entire want of care as to indicate that the act or omission in question was the result of conscious indifference to the rights, welfare, or safety of the persons affected by it.

The jury was further instructed that they could consider four particular acts or omissions on the part of Harris in considering their answer to this issue:

1. speed;

2. failure to keep a proper lookout;

3. driving while under the influence of intoxicating liquors;

4. failure to maintain an assured clear distance between his vehicle and that driven by Cantu.

The fundamental issue presented by this appeal is whether the evidence supports the finding of exemplary damages. Appellant cites the myriad cases on the subject which preceded *Burk Royalty v. Walls*, 616 S.W.2d 911 (Tex.1980), all of which have been examined carefully; but we now have an entirely new ballgame in the field of gross negligence, so we do not find many of the earlier cases either controlling or persuasive.

We note in passing that the definition of gross negligence quoted above is substantially that approved by the Supreme Court in *Burk Royalty*, being that promulgated in the Texas Pattern Jury Charges. 616 S.W.2d at 920. We will follow the teachings of *Burk Royalty* by applying "the traditional no-evidence test" to see if there is some evidence to support the jury's finding of gross negligence (616 S.W.2d at 921) and, in doing so, will consider the evidence under the standards laid down in *Harbin v. Seale*, 461 S.W.2d 591, 592 (Tex.1970), as

quoted in *Burk Royalty* (616 S.W.2d at 922), and also those rules laid down in *Garza v. Alviar*, 395 S.W.2d 821, 823 (Tex. 1965), as suggested by *Burk Royalty* at the last cited page of this opinion.

■ We are told that we should consider all the actions or circumstances indicating a state of mind amounting to a conscious indifference in making this decision. However, we are disturbed by one factor which is not in accord with most of the cases we have examined on the subject. It will be recalled that, both in the issue on ordinary negligence and that on gross negligence, the jury was specifically instructed that it could consider evidence that defendant was operating his vehicle while under the influence of intoxicating liquors. It has long been the rule that, while the jury may consider ingesting of intoxicating liquor in determining whether or not a party was negligent in some other respect, e.g., speed or lookout (both of which were present in this case), the intoxication is not an ultimate, controlling issue, but is, instead, an evidentiary issue. *See Benoit v. Wilson*, 150 Tex. 273, 239 S.W.2d 792 (1951). The trial court should not have called attention to the drinking in the instruction. See and cf., *Scott v. Gardner*, 137 Tex. 628, 156 S.W.2d 513, 518 (1941); *Harker v. Coastal Engineering Inc.*, 672 S.W.2d 517, 524 (Tex.App.—Corpus Christi 1984, writ ref'd n.r.e.).

■ Even if we assume appellant's major premise, that it was error for the trial court to include the instruction on drinking in the negligence issues, we do not find that such error was of such a nature as to constitute reversible error.

■ Having considered the record under the standards set out in *Burk Royalty* and *Garza*, we do not find merit to the first two points of error attacking the finding of gross negligence, and each of such points is overruled.

The third and fourth points of error complaining of the submission of intoxication as an element of negligence and gross negligence do not, in our opinion, constitute reversible error, and such points are overruled. Appellant argues that the instruction was calculated to lead the jury to believe that Harris' drinking was a controlling issue, instead of his overall operation of the vehicle. We remain unpersuaded. When Harris "passed out" while talking to the police officers just minutes after the accident, it would have been impossible for the jury to have erased such fact from their minds, even if the Court had instructed them to do so. Intoxication was in this case from the very beginning, and we do not find error.

■ The remaining two complaints attack the damage awards to Ramon Cantu on the grounds that there was no evidence, or, alternatively, insufficient evidence, to sustain a finding of loss of earnings in the past (Point five) or loss of physical ability in the future (Point six).

We have searched the record carefully and find that Cantu testified as to his having lost several weeks' work because of his injury; and he, as well as Dr. Kuri, testified that he had a weakened back, more susceptible of injury than before the accident. Considering the record as a whole, we overrule both of the points, five and six. *See Garza v. Alviar*, 395 S.W.2d at 823. The judgment of the trial court is AFFIRMED.